## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| INVENTUS POWER, INC. and ICC ELECTRONICS (DONGGUAN) LTD., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 20-cv-3375 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| SHENZHEN ACE BATTERY CO., LTD., | ) ) ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Inventus Power, Inc. ("Inventus") and ICC Electronics (Dongguan) Ltd. ("ICC") (together, "Plaintiffs") bring suit against Defendant Shenzhen Ace Battery Co., Ltd. ("ACE" or "Defendant") for trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 *et seq.* ("DTSA"), and the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.* ("ITSA"). Currently before the Court are Plaintiffs' motion for temporary restraining order ("TRO") [6] and motion for expedited discovery [16]. For the following reasons, Plaintiffs' motion for TRO [6] is granted. Plaintiffs' motion for expedited discovery [16] is granted in part and denied in part; expedited discovery shall be mutual and limited to the matters at issue in the motion for preliminary injunction. A bond in the amount of $50,000 shall be posted by Plaintiffs. This case is set for a telephonic status hearing on July 17, 2020 at 10:30 a.m. Counsel should use the Court's toll-free call-in number 877-336-1829, conference access code is 6963747.

### I. Background

Plaintiff Inventus is a Delaware corporation headquartered in Woodridge, Illinois. Inventus has built advanced battery and power systems for global original equipment manufacturers ("OEMs") for more than sixty years. Inventus specializes in the design and

manufacture of lithium ion battery packs, smart chargers, and efficient power supplies across a broad range of portable, mobile, and stationary applications. According to the governing complaint and materials submitted in support of the TRO motion, Inventus invests heavily to support its engineering and business teams to create industry leading technologies and products. Inventus relies on its trade secrets to guard the intellectual property created by the ingenuity and industry of its employees.

Plaintiff ICC is a Chinese corporation and wholly owned subsidiary of Inventus located in Guangzhou, China. According to the complaint and additional materials submitted with Plaintiffs' TRO motion, Inventus' research and development ("R&D") team, based out of its Woodridge headquarters, works regularly with the R&D engineering team in Guangzhou to "review source code for Inventus projects, provide critical feedback from customer testing, provide requirements specifications, hardware-software interfaces, and state machine diagrams, which are all integrated into Inventus's source code." [1] at 9. The two teams share a network drive that allows the Guangzhou team (including several team members who subsequently became ACE employees and are accused of taking Plaintiffs' trade secrets) to request and access highly confidential materials that originated in the Woodridge headquarters and enables the Woodridge team to upload those materials for use by the Guangzhou team.

Defendant ACE was founded in Shenzhen, China in 2014 and entered the battery market that Inventus claims to have developed. According to the complaint, Defendant, "[e]ager to tap into the battery market developed by Inventus," "embarked on an unlawful plot to surreptitiously take Inventus's confidential and proprietary trade secrets, and use those trade secrets to build and test competing products." [1] at 2. "Rather than design its own products to compete fairly in the marketplace," the complaint alleges, Defendant "instead misappropriated Inventus's proprietary

technologies and critical business strategies." *Id*. "This included surreptitiously taking Inventus's confidential documents and source code embodying critical technologies for Inventus's products and other highly valuable confidential Inventus information." *Id*.

Defendant's plan allegedly began with a plot to recruit high-ranking personnel from Inventus, including individuals who had substantial access to Inventus's proprietary technologies ("ACE Employees").[1] The complaint alleges that these individuals, at Defendant's direction, downloaded more than 100,000 confidential technical documents and source code from Inventus's computers in the weeks and days prior to their departure in order to benefit Defendant's business. The highly confidential materials included documents concerning Inventus's products and business operations, including numerous requirement documents, design documents, testing documents, source code, and detailed specifications regarding Inventus's small and medium-to large battery pack projects.

Specifically, in order to expand into the battery pack market, beginning at least as early as mid-2019, Defendant allegedly lured away several Inventus senior engineers who were extensively familiar with Inventus's technologies and intellectual property, and who had or could gain access to other confidential Inventus information. Defendant hired these employees to work in senior

---

[1] According to the complaint, [1] at 3-4, the scheme included at least the following individuals whom Defendant recruited from ICC: Gang (Lucken) Cai, who formerly served as a Supporting Engineering Director in the Qualification and Costing Department for Inventus and now serves as the R&D Director at ACE; Kui (Gerrard) Liu, who formerly served as a Chief Firmware Engineer for Inventus and now serves as Firmware Manager at ACE; Guochao (Andy) Quan, who formerly served as a Compliance Engineering Manager for Inventus and now leads the Safety Regulation Lab at ACE; Xinliang (Robert) Cao, who formerly served as a Mechanical Engineering Manager for Inventus, and now serves as the Senior Manager in the Mechanical Team at ACE's R&D department; Jun (Yancey) Yang, who formerly served as an Assistant Firmware Engineering Manager at Inventus, and now serves as the head of the software team at the R&D department at ACE; Haihua (Alan) Liu, who previously served as a Senior Systems Engineer at Inventus and now serves as Assistant Field Application Engineer Manager at ACE; Jina (Conner) Guan who previously served as a Senior Systems Engineer at Inventus and now serves as Assistant Field Application Engineer Manager at ACE; and Jingyang (Paul) Mai, who previously served as a Senior Qualification Engineer at Inventus, and now serves as Assistant BMS Design & Qualification Manager at ACE.

positions at Defendant, allegedly for the purpose of developing products that directly compete with those they previously worked on at Inventus. Defendant allegedly instructed the employees to unlawfully take Inventus's confidential trade secret materials to Defendant for use in their work at Defendant, including by using information taken from Inventus to develop and test battery components for Defendant's own products within their work responsibilities as engineers and managers at Defendant.

In its TRO submissions, Plaintiffs provide details concerning the forensic inspection of their computer systems performed between April and June, 2020. In a declaration filed under seal, Plaintiffs' outside forensic examiner details how, with Inventus' assistance, he obtained the computers of Kui (Gerrard) Liu ("Liu"), Lucken Cai ("Cai"), Yancey Yang ("Yang"), and Andy Quan ("Quan") and forensically imaged the hard drives. See [11] (sealed declaration of Zack Lau). He also obtained the forensic image of Yang's external hard drive used at Inventus. According to Lau, his investigation revealed that ACE employees had engaged in consistent mass downloading of tens of thousands of documents and large volumes of source code prior to their departure. All of the materials that were taken were kept strictly confidential within Inventus, and the systems are password protected. Lau opines that the ACE Employees' file access activities do not reflect legitimate usage of Inventus's systems or confidential materials. This conclusion is supported by the ACE Employees' use of USB external storage devices and attempts to conceal mass downloading of Inventus's confidential materials, e.g., by uninstalling Baidu Netdisk.

Plaintiffs' complaint, briefs in support of the TRO, and supporting declarations and other materials detail multiple examples of former employees, including Liu, Cai, Yang, and Quan, intentionally taking from Plaintiffs trade secrets that were developed in Illinois. As one example of alleged intentional misappropriation, the complaint alleges:

4

Robert Cao served as a Mechanical Engineering Manager at Inventus. Cao was one of the first engineers recruited by [ACE] to steal Inventus's trade secrets—his last day at Inventus was August 16, 2019. In accordance with [ACE]'s plan, during his last weeks at Inventus, Cao mass downloaded hundreds of documents encompassing Inventus's trade secrets, only to immediately depart to [ACE] with those documents pursuant to [ACE]'s direction. The documents accessed by Cao included confidential schematics, drawings, technical presentations, and design specifications describing Inventus's trade secret technologies. These materials included documents and information that [ACE] knew originated at Inventus's Illinois headquarters in this District as well as the technologies in them, including documents and information that originated from Inventus in Woodbridge, IL. Moreover, Cao requested and/or accessed these materials using his work computer. [ACE] used these confidential documents, including confidential schematics and design guidelines, to improve and design products that compete with Inventus. Cao is currently the Senior Manager in the Mechanical Team at [ACE]'s R&D department. Moreover, [ACE] used confidential Inventus's documents and information, including designs for products that Inventus has not yet released, to file patent applications in Cao's name shortly after he joined [ACE] from Inventus. In particular, Cao is the sole named inventor of the following patents, which list [ACE] as the assignee: Chinese Patent Nos. CN210467927U, titled "A lithium battery packaging container;" CN210272576U, titled "A lithium ion battery cell integration and packaging;" and CN210272484U, titled "A lithium ion battery formation cabinet." These patents include Inventus's trade secret information, and were filed on September 20, 2019—a mere 35 days after Cao joined [ACE][.] These patents include schematics, drawings, and descriptions of various aspects of the mechanical engineering and manufacturing processes that are substantially similar to the confidential technology designed by Inventus for its medium-to-large sized battery packs, which have not yet been released to the public.

[1] at 23-24.

Plaintiffs contend that Cao and the other ACE employees accused of taking trade secrets were acting within the scope of their employment with ACE when they engaged in acts of misappropriation. According to the complaint, ACE "acquired, used, and/or disclosed Inventus's trade secrets by instructing and allowing" Plaintiff's former employees "to acquire and/or use Inventus's trade secrets and confidential information in … Defendant's products and strategies." [1] at 30. ACE's alleged design was to "avoid time-consuming and expensive investments in its own research and development, obtain a massive time savings in releasing its products to the market, and unlawfully earn substantial sums by taking away Inventus's current and potential

customers using Inventus's own technology against it in competing products." *Id*. Based on these allegations Plaintiffs bring claims for violation of the DTSA (Count I, brought on behalf of Inventus only) and the ITSA (Count II, brought on behalf of both Plaintiffs).

At the same time Plaintiffs filed their complaint, they filed a motion for a TRO seeking to enjoin Defendant from possessing, disclosing, or using their trade secrets. In support of their motion, Plaintiffs have submitted three briefs and supporting declarations and exhibits. See [8] (opening brief); [9] (declaration of Tom Nguyen); [10] (declaration of Nuo Ma); [11] (declaration of Zack Lau); [12] (declaration of Gianni Cutri); [34] (reply brief); [35] (declaration of Bo (Tom) Li); [36] (declaration of Guanghi (Sigma) Xu); [40] (sur-surreply brief). Plaintiffs have also filed a motion for expedited discovery [16]. Defendants have filed two briefs and their own supporting materials. See [32] (response brief); [38-1] through [38-4] (surreply and declarations of Yancey Yang, Gerrard Liu, and James Zhao). The details of the parties' submissions are discussed in the analysis below, with the focus primarily on the contested portions.

## II.    Motion for Temporary Restraining Order

### A.    Legal Standard

The standard for issuing a TRO is the same one that governs issuance of a preliminary injunction. See *Mays v. Dart*, -- F. Supp. 3d --, 2020 WL 1812381, at *5 (N.D. Ill. Apr. 9, 2020); *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001)). The decision whether to issue a preliminary injunction or TRO involves a two-step inquiry, with a threshold phase and a balancing phase. See *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1128 (N.D. Ill. 2019). "First, the party seeking the preliminary injunction has the burden of making a threshold showing: (1) that he will suffer irreparable harm absent preliminary injunctive relief during the pendency of his

6

action; (2) inadequate remedies at law exist; and (3) he has a reasonable likelihood of success on the merits." *Whitaker,* 858 F.3d at 1044; see also *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018). "If the movant successfully makes this showing, the court must engage in a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Whitaker*, 858 F.3d at 1044. The Court "employs a sliding scale approach" to the balancing analysis; "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Valencia*, 883 F.3d at 966 (internal quotations marks and citation omitted). "Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

### B. Analysis

#### 1. Likelihood of Success on the Merits

"A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his claims are 'better than negligible.'" *Whitaker*, 858 F.3d at 104 (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). As the Seventh Circuit has explained, this is a relatively low bar. *Id*. (citing *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011)).

##### a. Jurisdiction and Venue

Defendant argues that Plaintiffs are unlikely to succeed on the merits of their action because Plaintiffs "fail to properly establish personal jurisdiction over Defendant and proper venue before this Court." [32] at 5. Defendant emphasizes that the employees accused of stealing Plaintiffs' trade secrets are Chinese nationals working in China who were employed by one

Chinese corporation (ICC) before moving to employment at another Chinese corporation (Defendant). According to Defendant, "[v]irtually all witnesses and evidence regarding this dispute are likely to be found in China." *Id*. at 6. Defendant also points out that a cease and desist letter sent from Plaintiffs to Defendant in January 2020 "even contends Defendant's actions constitute a violation of Chinese unfair competition law." *Id*. In addition, Defendant asserts that "serious questions exist as to whether an order issued by this Court would even be enforceable against Defendant," and concludes that it therefore "has a strong case to dismiss the action under the doctrine of forum non conveniens as China is the more appropriate forum to hear the parties' dispute." *Id*. Defendant has not yet filed a motion to dismiss on either of these grounds, and its briefs contain little to no discussion of the applicable rules or case law. For the reasons explained below, the Court believes that Plaintiff has at least a reasonable likelihood of both establishing personal jurisdiction and defeating a motion to dismiss for forum non conveniens.

A complaint need not allege personal jurisdiction, but once a defendant moves to dismiss on that ground, the plaintiff bears the burden of establishing that jurisdiction is proper under both the federal and Illinois constitutions. *Purdue Res. Found v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). The Illinois long-arm statute "permits its courts to exercise personal jurisdiction on any basis permitted by the constitutions of both Illinois and the United States." *BE2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011); see also 735 ILCS 5/2-209(c). Thus "the state statutory and federal constitutional inquiries merge." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). The federal test for personal jurisdiction under the Due Process Clause of the Fourteenth Amendment authorizes a court to exercise jurisdiction over a non-resident defendant only if the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  In other words, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  The requirement that a defendant have "minimum contacts" with the forum ensures that a non-resident defendant will not be forced to litigate in a jurisdiction as a result of "random, fortuitous, or attenuated contacts" with the forum or the unilateral activity of the plaintiff; the defendant "should reasonably anticipate being haled into court" there.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985).

"Personal jurisdiction can be either general or specific, depending on the extent of the defendant's contacts with the forum state."  *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010).  The Court finds it unnecessary to consider whether general jurisdiction might exist over Defendant, because Plaintiffs have identified sufficient contacts between their claims and the state of Illinois—which Defendant does not address in either of its briefs—to conclude that Plaintiffs have a likelihood of success in establishing specific personal jurisdiction.

There are three "essential requirements" for the exercise of specific jurisdiction over an out-of-state defendant: "'First, the defendant's contacts with the forum state must show that it "purposefully availed [itself] of the privilege of conducting business in the forum state or purposefully directed [its] activities at the state.  Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities.  And finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice.'"  *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 398 (7th Cir. 2020) (quoting *Lexington Ins. Co. v. Hotai Ins. Co., Ltd*., 938 F.3d 874, 878 (7th Cir. 2019)).  In intentional tort cases such as this one, "the

purposeful availment inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state," and looks to "whether the plaintiff has shown '(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state.'" *Walls v. VRE Chicago Eleven, LLC*, 344 F. Supp. 3d 932, 944 (N.D. Ill. 2018) (quoting *Tamburo*, 601 F.3d 702-03); see also *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) ("misappropriation of a trade secret is an intentional tort").

Plaintiffs have identified sufficient contacts to show a likelihood of establishing specific personal jurisdiction over Defendant. To begin, there is evidence that ACE purposely avails itself of the privilege of conducting business in Illinois. ACE markets its battery products in this District though in-person attendance at trade shows. For example, Plaintiffs present evidence that ACE attended the 2019 PROMAT trade show in Chicago to market and sell the same battery products at issue in this case. ACE also maintains an English-language website to market its battery products to customers in the United States, including in this District. Specific personal jurisdiction has been found under similar facts. See *Virgin Enterprises Ltd. v. Jai Mundi, Inc.*, 2014 WL 3605541, at *4 (N.D. Ill. July 18, 2014) (specific personal jurisdiction based on Defendant's global website and attendance at one trade show in the forum).

In addition, ACE's alleged misappropriation was allegedly knowingly directed to materials that originated from and are located at Inventus in this District. Plaintiff presents evidence (including a forensic analysis and declarations) that ACE employees, while working for Plaintiff and for the purpose of aiding Defendant, downloaded *en masse* volumes of documents that originated at Inventus's facilities in this District, and were either placed on a shared network drive accessed by the employees or emailed to them, at their request. In particular, Plaintiffs provide a

10

declaration from Tom Nguyen ("Nguyen"), the Vice President of Business Development for Inventus' commercial and industrial team for medium-to-large sized battery packs at Inventus's Woodridge, Illinois headquarters.  See [9].  Nguyen states that he knew Yang personally during his employment at Inventus and worked with him on projects relating to medium-to-large sized battery pack technologies, small battery pack technologies, compliance and testing technologies, and mechanical engineering and manufacturing technologies.  According to Nguyen, Yang was privy to the research and development for the software for all of Inventus's battery pack solutions and the software for regulatory compliance and had access to and gained extensive knowledge of Inventus's related trade secret information.  Yang's role centered around using the details of customer specifications, provided by Nguyen's team based in Woodridge, Illinois, to ensure that Inventus could develop products meeting customer requirements.  Nguyen's team at the Woodridge facility drives the creation of detailed production specifications and would share this information with Yang.  Nguyen's team also shared required changes to source code with Yang, which Yang had access to either through a server in Hong Kong or through email requests and exchanges with employees in Woodridge.

Nguyen provides similar details about six former Inventus employees who left Plaintiffs for ACE and were privy to similar trade secret information, which they obtained through their work with Nguyen's team in Woodridge.  Nguyen opines that these employees knew that the trade secret materials were developed in Woodridge, Illinois based on their frequent interactions with Nguyen's team, their frequent requests for highly confidential information from the Woodridge team, and because a large number of the relevant documents are marked as originating from "Woodridge, IL."  Plaintiffs' alleged injuries arose, at least in part, out of these contacts, which gave Defendant's employees (and Plaintiffs' former employees) access to the trade secrets that

11

they allegedly misappropriated. Compare *Allstate Ins. Co. v. Ameriprise Fin. Servs.*, 317 F. Supp. 3d 1006, 1009-11 (N.D. Ill. 2018) (court could exercise specific personal jurisdiction over non-resident competitor in manner consistent with due process, in action brought by insurance companies alleging violation of DTSA, where competitor met or had telephone contact with ten individuals in Illinois who were affiliated with those companies and allegedly solicited and obtained companies' confidential information from those individuals which it then used to companies' detriment); *DEX Sys., Inc. v. Deutsche Post AG*, 727 F. App'x 276, 278 (9th Cir.) (2018) (finding personal jurisdiction when a foreign company accessed Plaintiff's servers and knew the servers to be owned by Plaintiff).

Turning to venue, Plaintiffs have at least a reasonable likelihood of defeating a motion to dismiss for forum non conveniens, to the extent that Defendant decides to file one. Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred" or "if there is no district in which an action may otherwise be brought . . . any judicial district in which any defendant is subject to the court's personal jurisdiction." 28 U.S.C. § 1391(b). Here, Inventus is headquartered, originated the trade secrets, and allegedly has suffered harm in this District.

"The doctrine of forum non conveniens allows a federal court to dismiss a claim when a foreign jurisdiction would provide a more convenient forum to adjudicate the matter, and dismissal would serve the ends of justice." *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 386 F. Supp. 3d 926, 949 (N.D. Ill. 2019). The doctrine "is an exceptional one that a court must use sparingly." *Deb v. SIRVA, Inc.*, 832 F.3d 800, 805 (7th Cir. 2016). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* at 806 (internal quotation marks and citation omitted). "To determine whether a dismissal for

forum non conveniens is appropriate, a court first must determine if an alternative and adequate forum is available and then go on to balance the interests of the various participants." *Id*. at 807. "We start with the availability of the forum because, '[a]s a practical matter, it makes little sense to broach the subject of forum non conveniens unless an adequate alternative forum is available to hear the case.'" *Id*. (quoting *Kamel v. Hill–Rom Co.*, 108 F.3d 799, 802 (7th Cir. 1997)). "The availability of the forum is really a two-part inquiry involving availability and adequacy." *Id*.

Defendant, which bears the burden of showing that dismissal on forum non conveniens grounds would be appropriate, has not established that its proposed alternative forum, China, is available—meaning that "all parties are amenable to process and are within the forum's jurisdiction." *Id*. Nor has it offered any evidence, beyond assertion and speculation, that China would be an adequate forum. While "[a] forum is not inadequate merely because the law in the foreign jurisdiction is less favorable to the party opposing dismissal," *Deb*, 832 F.3d at 807, Defendant has made no attempt to establish that Plaintiffs "will not be deprived of all remedies or treated unfairly" in China. *Id*. Defendant is free to revisit the issue in a motion to dismiss (assuming it is timely), but the Court will not deny Plaintiffs' request for a TRO on the exceptional grounds of forum non conveniens based on the scant argumentation Defendant has provided to date. Given the absence of a showing that China would be an adequate forum, the Court finds it unnecessary to balance the interests of the various participants at this time.

**b.    Trade Secret Claims**

Plaintiffs bring claims under both the federal DTSA and the Illinois ITSA. A threshold issue raised by Defendant is whether the statutes have extraterritorial reach—*i.e.*, whether they apply to conduct occurring outside the borders of the United States (or Illinois, in the case of the ITSA). The extraterritorial reach of both statutes was recently addressed in extensive detail in

13

*Motorola Solutions, Inc. v. Hytera Communications Corp.*, 436 F. Supp. 3d 1150 (N.D. Ill. 2020). Plaintiffs repeatedly cite that decision with approval, and the Court is guided by it here in concluding that Plaintiffs have a likelihood of establishing the extraterritorial reach of the DTSA, but not the ITSA, to the misappropriation alleged in this case.

By its statutory terms, the DTSA "applies to conduct occurring outside the United States if—the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837; see also *vPersonalize Inc. v. Magnetize Consultants Ltd.*, 437 F. Supp. 3d 860, 878 (W.D. Wash. 2020) ("18 U.S.C. § 1837 authorizes civil enforcement actions against foreign entities to the same extent as criminal actions" (collecting cases)).  Only subsection (2) is implicated here; therefore, the Court's extraterritoriality analysis is limited to whether Plaintiffs have come forward with sufficient evidence to show a likelihood of success in ultimately establishing that "acts in furtherance of" Defendant's alleged misappropriation were committed in the United States.

The Court agrees with Plaintiffs that most if not all of the same acts discussed above which support a finding of minimum contacts for purposes of jurisdiction also may constitute "acts in furtherance of" Defendant's alleged misappropriation for purposes of the DTSA.  Plaintiffs have presented evidence supporting their claim that the stolen materials originated in Woodridge, Illinois and were transferred to the employees who now work at ACE at those employees' request, via shared servers or email.  See *vPersonalize*, 437 F. Supp. 3d at 879 (allegations by maker of custom clothing designer software that competitor, a United Kingdom-based entity, improperly obtained access to its proprietary product, patterns, software code and technical documents through

at least one third-party in the United States, held sufficient to state claim under extraterritoriality provision of the DTSA).

Plaintiffs also have presented evidence that ACE marketed and sold in the United States the battery products for which the trade secrets were allegedly taken. In particular, a few months after the first known incident of mass downloading in early July 2019, ACE attended a battery technology trade show in Salt Lake City to market and sell such battery products. See [1] at 12; [1-5]. Trade show attendance has been found to constitute an act in furtherance of a violation under § 1827(2). See *Motorola*, 436 F. Supp. 3d at 1165 (§ 1827(2) applied where evidence at bench trial showed defendants "advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows" in the United States (citing *General Univ. Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450 (5th Cir. 2007); *Cognis Corp. v. CHEMCENTRAL Corp.*, 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006)); see also *Luminati Networks Ltd. v. BIScience Inc.*, 2019 WL 2084426, at *1 (E.D. Tex. May 13, 2019) (allegation that foreign corporate defendant used plaintiff's trade secrets in the United States to sell its service, "or at least committed acts in furtherance of such sales in the United States," held sufficient to state "a claim actionable under the DTSA").

The Court now turns to the ITSA. In *Motorola*, the court held that the ITSA does not have extraterritorial application. The court explained that under Illinois principles of statutory interpretation, which apply to the interpretation of the ITSA, "when a statute … is silent as to extraterritorial effect, there is a presumption that it has none." 436 F. Supp. 3d at 1168. This Court agrees with *Motorola* that it does not clearly appear from the language of the ITSA that the statute is intended to have extraterritorial reach, and therefore it is proper to apply the presumption that it does not. See *id*. at 1168-70.

15

Even if the ITSA does not apply extraterritorially, Plaintiffs might nonetheless pursue a claim under that statute if doing so would not "in fact require extraterritorial application of the statute." *Armada (Singapore) Pte Ltd. v. Amcol Int'l Corp.*, 244 F. Supp. 3d 750, 757 (N.D. Ill. 2017). "To determine whether a particular claim requires a statute to be applied extraterritorially, Illinois courts consider whether the circumstances relevant to the claim are alleged to have occurred 'primarily and substantially' in Illinois." *Id*. (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005)). Plaintiffs' analysis of the extraterritorial application of the ITSA focuses on whether "acts in furtherance" of the alleged misappropriation were committed in the United States. See [40] at 10. However, that standard comes from the statutory language of, and therefore applies only to, the DTSA. The parties do not discuss whether "the circumstances relevant to the claim are alleged to have occurred 'primarily and substantially' in Illinois." Given that the employees accused of stealing Plaintiffs' trade secrets are Chinese nationals working in China who were employed by one Chinese corporation (UCC) before moving to employment at another Chinese corporation (Defendant), it appears unlikely that Plaintiffs could prevail on a theory that the relevant circumstances occurred "primarily and substantially" in Illinois.

In short, the Court concludes that Plaintiffs have not demonstrated a likelihood of establishing that the misappropriation alleged in the complaint is actionable under the ITSA. In the following analysis of the merits of Plaintiffs' claims, the Court therefore focuses on the extraterritorial viability of the DTSA claim. With that said, to the extent the Court is wrong about Plaintiffs' ability to proceed under the ITSA, its merits analysis of the DTSA claim would apply substantially to the ITSA claim as well, because "'the pertinent definitions of the two acts overlap.'" *Aon Risk Servs. Cos. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 847 (N.D. Ill. 2019) (quoting *Vendavo*, 397 F. Supp. 3d at 1129).

16

To show that Defendant misappropriated their trade secrets, Plaintiffs "must demonstrate that the information in question was '(i) secret (that is, not generally known in the industry), (ii) misappropriated (that is, stolen from it rather than developed independently or obtained from a third source), and (iii) used in … defendant['s] business.'" *Vendavo*, 397 F. Supp. 3d at 1129 (quoting *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992)).

The trade secrets claimed by Plaintiffs consist of approximately 100,000 confidential technical documents and source code that, according to Plaintiffs, were downloaded from Inventus's computers by high-ranking Inventus personnel in the weeks prior to their departure to work for Defendant. The materials consist of documents concerning Inventus's products and business operations, including numerous requirement documents, design documents, testing documents, source code, and detailed specifications (including for specific customers) regarding Inventus's small and medium-to large battery pack projects. Defendant does not dispute that these types of documents may constitute trade secrets. See, e.g., *Aon*, 415 F. Supp. 3d at 848 (recognizing that "data compilations, proprietary tools, client information [and] client lists" may constitute trade secrets); *Vendavo*, 397 F. Supp. 3d at 1131 (customer-specific information recognized as protectable trade secret); *Motorola, Inc. v. Lemko Corp.*, 2012 WL 74319, at *16-17 (N.D. Ill. Jan. 10, 2012) (product source code and documentation, product roadmaps, and testing tools found to be protectable trade secrets); *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *26 (N.D. Ill. Jan. 2, 1996) ("Illinois courts routinely hold confidential customer information, confidential pricing procedures, and other confidential methods, formulas, procedures and equipment capabilities learned and used in the course of confidential employer-employee

relationships as protectible."). Nor does Defendant dispute Plaintiffs' representations concerning their efforts to keep their trade secrets confidential.

Instead, Defendant argues that Plaintiffs' trade secrets are so "ill-defined" that it would be effectively impossible to determine whether any of Defendant's products used or were designed through the misappropriation of Plaintiffs' trade secrets. [32] at 5. Defendant contends that it would be "extremely unduly burdensome" if Defendant "and its distributors/affiliates should be made to compare all" of Defendant's "products against the claimed over 100,000 documents worth of trade secrets." *Id*. The Court does not find this argument persuasive. To the extent that the sheer volume of alleged trade secrets places a "burden" on Defendant, that is simply a result of the scale of the alleged misappropriation claimed by Plaintiffs and supported, at least in this early stage of the case, with persuasive forensic evidence. Further, Defendant still employs most of the former Inventus employees who are accused of taking the data. If they actually took and are using the trade secrets identified by Plaintiffs in their work at Defendant, it should not be terribly difficult for Defendant to figure out through forensic examinations of the electronic devices used by the individuals in question. And to the extent that a conflict arises concerning any particular product of Defendant's that Plaintiffs claim uses their trade secrets, the parties can bring it to the Court for resolution.

Moreover, Defendant largely ignores the detail that Plaintiffs have provided concerning the trade secrets they seek to protect. Plaintiffs have submitted a 22-page declaration from Inventus' Vice President of Business Development detailing the trade secrets Defendant allegedly misappropriated—including source code and related documentation for particular projects and technologies—and explaining why the trade secrets provide value to Inventus by virtue of being secret. More generally, Plaintiffs have identified five specific categories of trade secrets

18

misappropriated by Defendant: (1) platform technologies for advanced small and medium-to-large sized battery packs; (2) compliance and testing techniques; (3) mechanical engineering and manufacturing technologies; (4) proprietary business strategy information; and (5) confidential human resources information. These disclosures are at least as detailed as those supporting other injunctions issued in this District. See, e.g., *Vendavo*, 397 F. Supp. at 1130-31 (the following five categories of information former employee allegedly stole and delivered to Vendavo were "sufficiently definite for the Court to determine what information comprises the secret and whether it was kept secret": "(1) Vendavo's customer list, including identification of future customers and customer revenue potential; (2) Vendavo's sales projections and its sales "pipeline" it has cultivated for its future growth; (3) Vendavo historical sales revenue reports; (4) Vendavo's most up-to-date marketing plans, including details of Vendavo's future plans for client and product development; and (5) Vendavo's current and future pricing models, including the 'science' behind how it prices its products").

The Court next assesses whether Plaintiffs are likely to succeed in demonstrating that Defendant has misappropriated its trade secrets. In its response to the TRO motion, Defendant claims to have no knowledge of whether its employees who previously worked for Plaintiffs took any trade secrets before coming to its employ. In its surreply, Defendant attaches declarations from two of the employees, both of whom deny any misappropriation. In particular, Yang denies taking any of the confidential technical documents and source code that Plaintiffs accuse him of bringing to Defendant. [38-2] at 4. Yang states that one of his duties at ICC "was to download the documents and source codes from the server of ICC and then stored them in external portable hard disks for the purpose of back up." *Id.* at 3. According to Yang, he "would not know the exact contents of the documents and source codes as the volume of the back up was huge." *Id.*

The second employee providing a declaration is Liu, the manager of ACE's Software Department. At ICC, Liu was "responsible for the development of software (also called firmware) for battery packs." [38-3] at 2. Liu states that he "did not download or copy any of the software from the server of ICC for other personal purposes other than for work-related purpose for ICC." *Id*. Liu further states that he understands that "Plaintiffs accused me of downloading 6,000 documents from my work computer and transferred them by connecting to the USB drive on October 9 & 10" 2019. *Id*. Liu denies this. He states that on October 9, he was out of the office for the entire day at a doctor's appointment; he also attaches medical records showing the time of his blood tests and X-ray exam. *Id*. On October 10, Liu states, he was "focused on handing over all my duties" in preparation for his last day working at ICC. *Id*. Liu also notes that other staff had access to his desktop computer before and after his departure. Liu explains that if he had "wanted to download all the confidential information" identified by Plaintiffs, "I would have done it before I tendered my resignation in September 2019, rather than doing it on my last day of work in front of many colleagues." *Id*.

These two declarations are not sufficient to overcome the forensic analysis and other evidence provided by Plaintiffs. Most obviously, there are employees other than Yang and Liu who allegedly took trade secrets, too—including Cao, whose name appears on the patent applications that allegedly contain Plaintiffs' trade secret information. Defendant offers no response to Plaintiffs' evidence showing that these employees also downloaded particular trade secret materials from ICC's servers shortly before their departures to work for Defendant. See generally [11] (Lau declaration describing results of forensic analysis).

The Yang and Liu declarations are not unassailable, either. Plaintiffs point out that although Yang claims that all of his downloading activity was part of his job of regularly backing

up Defendant's servers, he "still has no explanation for the 138,000-plus files he mass downloaded after the date he admits he stopped performing 'backups,' on December 12, 2019." [40] at 6; see also [38-2] at 3, 7 (Yang declaration and email showing back-up on December 12, 2019); [11] at 3; [11] at 3-4 (Lau declaration detailing Yang's downloading activity through January 11, 2020). Yang's former manager, Wenhua (Ewin) Li, also provided a declaration denying that he ever gave Yang specific instructions regarding how to conduct backups or received USB thumb drives from Yang, as Yang claims, because Plaintiffs prohibit the use of such devices. See [42].

Defendant's primary defense to misappropriation is that there is no evidence that Defendant knew about or directed the former Inventus employees' actions. According to Defendant, the evidence "is entirely devoid of any connection whatsoever between Defendant and the actions of the former employees." [32] at 3. Yet, Defendant acknowledges that Plaintiffs have presented evidence showing that shortly after Cao left Inventus to work for Defendant, Defendant filed three utility patent applications which allegedly contain Plaintiff's trade secret information.[2] More particularly, Cao joined Defendant from Inventus around September 2019, shortly after the forensic inspection shows Cao accessed hundreds of folders of technical documents (such as testing documents, specifications, data sheets, and design guidelines) from Inventus in July and August 2019. On September 20, 2019—just three weeks after Cao began at Defendant— Defendant filed three patent applications in China naming Cao as the only inventor.

Defendant contends that the evidence, viewed in the proper context, does not support the conclusion that it or Cao engaged in any wrongdoing. Defendant provides a declaration from its CEO, James Zhao, asserting that Cao was listed as the sole inventor "just for convenience" and

---

[2] While Defendant makes a passing argument in its surreply that the patents do not contain Inventus' trade secrets, it nonetheless recognizes that Plaintiffs have presented evidence that the content is "substantially similar" to Inventus' secret technologies. [38-1] at 5.

that "the patent agent was responsible for creating the drawing content of the utility model applications." [32-1] at 4. Defendant also admits, however, that Cao "was given the task to improve the IP portfolio of Defendant" when he joined Defendant. *Id*. at 3. Further, as Plaintiffs points out, the suggestion that a hired third-party patent agent, not Cao, drafted the patent applications fails to explain how Inventus's confidential information ended up in those applications, and only a month after Cao left Inventus. Indeed, ACE's agreement with the patent agent (which ACE has submitted as an exhibit) makes clear that ACE was responsible for providing the patent agent with "true and accurate technical information." [32-4] at 3. Notably, Cao does not provide a declaration denying his involvement with the patents, even though he is a current employee of Defendant.

Apart from Cao, Inventus has presented evidence that other Inventus employees who left the company for Defendant engaged in suspicious mass downloads as part of leaving to senior positions in Defendant's R&D/technology group with Cao—including Liu, Quan, and Yang— shortly after Cao joined Defendant in September 2019. One reasonable inference from such evidence is that the alleged theft of Inventus' trade secrets was directed by Defendant employees, including Cao, while acting within the scope of their employment at Defendant. Courts have authorized injunctive relief based on similar facts. See *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1142 (N.D. Ill. 2019) (enjoining company where individual retained a large amount of documents after termination and disclosed them to another employee); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 848-49 (N.D. Cal. 2019) (enjoining company where individual engaged in unusually high downloads and deletions and new company developed similar technology in unusually short time; noting that "[t]he implausibly fast development of technology can contribute to finding misappropriation").

22

The evidence may also support imposing liability on Defendant on a *respondeat superior* theory. See *Shager v. Upjohn Co*., 913 F.2d 398, 404 (7th Cir. 1990) ("The common law rule is that an employer is liable for intentional torts of its employees committed in furtherance of their employment[.]"); *Dana Container, Inc. v. Sec'y of Labor*, 2017 WL 430079, at *2 (7th Cir. Feb. 1, 2017) ("Conduct is within the scope of employment when [it is] actuated, at least in part, by a purpose to serve the [employer], even if it is forbidden by the employer."); *Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, 2019 WL 6467323, at *8–9 (N.D. Ill. Dec. 2, 2019) (corporate defendants may be liable for trade-secret misappropriation under *respondeat superior*). Defendant's only response is that *respondeat superior* cannot apply because all of the employees who allegedly took trade secrets were still employed by Plaintiff at the time of the alleged downloading. See [38-1] at 5. Defendant has not shown as a matter of law, however, that this would foreclose liability under a *respondeat superior* theory. See *Bombardier Inc. v. Mitsubishi Aircraft Corp.,* 383 F. Supp. 3d 1169, 1184 (W.D. Wash. 2019) (denying motion to dismiss DTSA claim and finding that plaintiff's allegation that "[Plaintiff's former employee] sent himself trade secrets shortly before starting work at [Defendant company]" was sufficient to state claim against Defendant under *respondeat superior* theory); cf. *Mangren Research & Dev. v. Nat'l Chem. Co.,* 87 F.3d 937, 944–45 (7th Cir. 1996) (once former employee of plaintiff apprised new employer of plaintiff's trade secrets and new employer made use of such trade secrets, new employer was liable for misappropriation under the ITSA); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001) (concluding following bench trial that competitor engaged in misappropriation of manufacturer's trade secrets under ITSA when sales representative defected from manufacturer to competitor and disclosed manufacturer's confidential customer information to competitor's personnel, and defecting sales representative and other sales representatives of

competitor began using disclosed information, which they knew had been acquired by improper means, to solicit customers).

Defendant also acknowledges the potential for liability under the DTSA based on the theory of inevitable disclosure,[3] but argues that Plaintiff has made an insufficient showing that it should apply in this case. The DTSA allows courts to grant injunctions in certain circumstances for "threatened" misappropriation, 18 U.S.C. § 1836(b)(3), which can be done by demonstrating the inevitability of trade secret disclosure, see *Packaging Corp.*, 419 F. Supp. 3d at 1069. "Courts examine three factors in an inevitable disclosure analysis: (1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken to prevent the use or disclosure of the former employer's trade secrets." *Id.* at 1070.

Plaintiff has a sufficient likelihood of success in establishing misappropriation through inevitable disclosure to justify entry of the TRO. Although Defendant asserts that there is "a lack of real competition between Plaintiff and Defendant," Defendant's CEO, Zhao, contradicts this, admitting in his first declaration that "both the Plaintiffs and Defendant are direct competitors in the LFP batteries packs" and "both the product lines and potential clients overlapped." [32-1] at 2. In a second declaration, he backtracks on this statement, see [38-4] at 2, with Defendant contending that it and Plaintiffs are "not meaningful competitors" and "ACE's impact and competition to Plaintiff is de minimis." [40] at 12. Zhao's change in testimony is somewhat

---

[3] "Although the Seventh Circuit has permitted inevitable disclosure claims under the ITSA, it has not explicitly allowed them under the DTSA. Other courts in this district, however, have analyzed inevitable disclosure under both laws, which suggests that the doctrine is available in either context." *Packaging Corp. of America, Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 n.7 (N.D. Ill. 2020) (citing *Indus. Packaging Supplies, Inc. v. Channell*, 2018 WL 2560993 (N.D. Ill. 2018); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531 (N.D. Ill. May 11, 2017); cf. *General Electric Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 834 (N.D. Ill. 2019) ("Consistent with other courts in this district, this Court finds that a DTSA claim based on inevitable disclosure may survive a motion to dismiss.").

suspect given his interest in disclaiming any competition, especially in light of other evidence of competition, including ACE's statement that Liu "develop[s] software for medium-large sized battery packs"—the same products Inventus claims incorporate its trade secrets. [38-1] at 9; see also [9] (Nguyen dec. at 10-11). The fact that Defendant applied for patents that allegedly incorporate Plaintiff's trade secret information further suggests that Defendant is competing in the same product market or making plans to do so.

Looking at the next factor, there is ample evidence that the employees who allegedly took Plaintiffs' trade secrets subsequently joined ACE in positions that are similar to the ones they held with Plaintiffs. ACE disputes that proposition only as to two of the employees, Gerrard Liu and Yancey Yang. ACE asserts that Liu now works on medium-to-large batteries instead of small batteries, but according to the declarations and supporting documentation from Plaintiffs, Yang worked extensively on medium-to-large batteries while employed by Plaintiffs and was privy to the research and development of software for all Inventus battery pack solutions. [9] at 2 (Nguyen dec).

Finally, ACE does not make a convincing showing that it has taken any actions to prevent the ACE employees from disclosing Plaintiffs' trade secrets. The only action Defendant has identified is requiring all new employees to sign an agreement not to use any confidential information or trade secrets of others during their employment with Defendant. However, Defendant does not cite any case law indicating that such an agreement, standing alone, is sufficient to avoid liability for an employee's alleged misappropriation. And in *PepsiCo.*, the Court concluded the opposite, albeit in interpreting the ITSA rather than the DTSA. *PepsiCo., Inc. v. Redmond*, 1996 WL 3965, at *21 (N.D. Ill. Jan. 2, 1996) ("[C]ontract with Quaker that

25

requires him not to disclose PepsiCo's confidential information while at Quaker . . . is not adequate to protect PepsiCo's information.").

### 2. Irreparable Harm and Inadequacy of Legal Remedies

In addition to showing that it has more than a negligible chance of succeeding on the merits, Plaintiff also must show that it will suffer an irreparable injury absent action by the court and that there is no adequate remedy at law. "These two requirements—irreparable harm and no adequate remedy at law—tend to merge." *Mintel Int'l Grp., Ltd. v. Neergheen*, 2008 WL 2782818, at \*5 (N.D. Ill. July 16, 2008) (citing *Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 387 (7th Cir. 1984)). "Irreparable harm is harm that is 'not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor.'" *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013).

A threshold issue in dispute is whether there is a presumption of irreparable harm in cases of trade secret misappropriation. Plaintiffs argue there is; Defendant takes the opposite position. While Defendant has identified a handful of out-of-circuit cases rejecting the presumption, see [32] at 9, the general consensus in this District appears to be that a presumption of irreparable harm does apply to cases of trade secret misappropriation and can be rebutted by the defendant by "demonstrating that [the] plaintiff will not suffer any harm if the injunction is not granted." *Vendavo*, 397 F. Supp. 3d at 1143-44; see also *Aon Risk Servs.*, 415 F. Supp. 3d at 851; *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004); *Moss Holding Co. v. Fuller*, 2020 WL 1081730, at \*8 (N.D. Ill. Mar. 6, 2020); *Signal*, 2018 WL 636769, at \*5; *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, at \*9 (N.D. Ill. Oct. 25, 2018); *Intertek USA Inc. v. AmSpec, LLC*, 2014 WL 4477933, at \*6 (N.D. Ill. Sept. 11, 2014). The Court will apply the

presumption here.  Even if it did not, however, Plaintiffs have provided sufficient evidence that they will suffer irreparable harm for which there is no adequate remedy at law.

A second threshold issue is whether Inventus' TRO motion should be denied on the basis of Plaintiffs' alleged unreasonable delay in filing suit.  According to Defendant, this delay reflects that Inventus does not "truly believe" that it will suffer irreparable harm, and in particular harm from Defendant filing Chinese patents containing Plaintiffs' trade secret information.  Defendant claims that Inventus waited five months between sending it a cease and desist letter and filing suit. Even assuming that such a delay would be unreasonable,[4] the factual record does not support Defendant's argument.  The cease and desist letter to which Defendant refers concerns Defendant's hiring of ICC's former employees and "reminds [Defendant] of certain post-employment contractual obligations" that the employees owe Plaintiffs and "various liabilities that you are subject to if you obtain Inventus['] trade secret by improperly soliciting and hiring" the employees. [32-2] at 2.  The letter does not accuse Defendant or the employees of misappropriating trade secrets.  The evidence provided by Plaintiffs shows that Defendant provided the requested assurances in a February 27, 2020 letter, which Plaintiffs view as further concealing the truth from them.  It was not until April 2020 that Plaintiffs' outside expert performed his forensic analysis and Inventus allegedly began to discover evidence of the mass downloading.  And the vast majority of the misappropriation activity was discovered after June 1, 2020.  See [9] at 21 (Nguyen dec.).

Plaintiffs persuasively argue that they have already been irreparably harmed, and will continue to be irreparably harmed, by Defendant's use and disclosure of Plaintiffs' trade secrets in patent applications, which "irreparably harms Inventus by stripping it of the power to control the

---

[4] The Court is not convinced that it would be.  See, e.g., *Surgipath*, 2009 WL 10713821, at *1 (granting TRO filed almost 5 months after learning of defendant's involvement with another company); *Ty, Inc. v. Jones Grp., Inc*., 98 F. Supp. 2d 988, 992 (N.D. Ill. 2000), *aff'd*, 237 F.3d 891 (7th Cir. 2001) (granting preliminary injunction despite eight-month delay).

use of its trade secrets and to recoup its substantial investments in creating them." [7] at 15. See *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983) (absent defendant's publication of plaintiff's trade secrets in a patent, plaintiff "had an option to patent the same" or "alternatively it could have retained the advantage of trade secrecy protection"). And Defendant's patent filings bolster Defendant's reputation as an innovator at Plaintiffs' expense.

Plaintiffs also identify several more general ways in which they will be irreparably harmed if a TRO is not issued enjoining the use of any of its trade secrets. First, ACE's sale of products that were improved and developed from Plaintiffs' trade secrets may cause Inventus to lose unrecoverable market share, which cannot be remedied by a money judgment. See *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 2008 WL 4531371, at *2 (N.D. Ill. May 22, 2008), *aff'd*, 595 F.3d 1340 (Fed. Cir. 2010) (entering injunction where plaintiff's market share was "important" and finding "[e]rosion of this intangible asset would cause incalculable extraneous injury to TT's business"). Nguyen explains in his declaration that the potential harm to Plaintiffs is particularly great because their business focuses on fostering long-term relationships with customers who need specially designed products on an ongoing basis. See [9] at 22. Second and relatedly, by avoiding the costs of developing its own products, Defendant is able to offer lower prices to steal market share, forcing Inventus to lower its own prices. See *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (in the context of preliminary injunction, "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm").

Defendant argues that the harm identified by Plaintiff is too speculative, because "Plaintiff fails to identify any product that supposedly contains its trade secret, or any action at all by Defendants (other than the patent applications…), which even threatens the harm claimed by

Plaintiff." [32] at 8. But "irreparable harm includes the impossibility of ascertaining with any accuracy the extent of the loss." *Mintel*, 2008 WL 2782818, at *5. And the patent applications—to the extent they contain Plaintiffs' trade secrets, a point that Defendant so far has not seriously contested—most certainly threaten the harms claimed by Plaintiff. Even if the products embodied in the patents are not yet on the market, Defendant's rapid development and filing of the patents after Cao joined the company—in addition to its attendance at trade shows to sell its products—suggest that the risk of harm is imminent. Defendant's alleged brazen use of some of Plaintiff's trade secret information in the patent applications may also suggest that Defendant will not hesitate to make use of the troves of additional highly confidential materials that its employees allegedly took from Plaintiffs. See *Whitaker*, 858 F.3d at 1045 (irreparable harm standard "requires more than a mere possibility of harm" but "does not, however, require that the harm actually occur before injunctive relief is warranted").

Finally, the Court must consider the balance of hardships. Defendant argues that the balance "tips strongly" in its favor because the "overly broad injunctive relief demanded by Plaintiffs" could cause a stoppage of "[a]ll of [Defendant's] manufacturing and distribution of all of its products worldwide." [32] at 10. However, Defendant offers no legitimate factual support for this claim. See *USCIC of N. Carolina RSA No. 1, Inc. v. Ramcell, Inc*., 2007 WL 3307022, at *5 (N.D. Ill. Nov. 6, 2007) (defendant "provides no specific evidence, however, suggesting imminent danger to the business" but "merely speculates as to eventual harm to the business"). As determined above, Plaintiffs have adequately identified the trade secrets they seek to protect. If none of Defendant's products use Plaintiffs' trade secrets, the injunction would not prohibit Defendant from continuing to sell those products. And if Defendant's products do use Plaintiffs' trade secrets, Defendant has no right to use them, and any harm it suffered as a result of the

29

injunction "would be a consequence of [its] own conduct." *Vendavo*, 397 F. Supp. 3d at 1146; see also *Zeigler Auto Group II, Inc. v. Chavez*, 2020 WL 231087, at *10 (N.D. Ill. Jan. 15, 2020). If a dispute arises over whether a particular product is covered by the protective order, the parties are free to bring the matter to the Court's attention for resolution.

Finally, the public has an interest in ensuring that trade secrets remain protected and that businesses do not engage in anti-competitive conduct. In sum, the Court concludes that (1) Plaintiffs will suffer irreparable harm absent a TRO; (2) inadequate remedies at law exist; and (3) Inventus has a likelihood of success on its DTSA claim; and the balance of harms favors Plaintiffs. Therefore, Plaintiffs are entitled to a TRO.

## III.    Motion for Expedited Discovery

As the parties' briefs recognize, the Federal Rules of Civil Procedure permit courts to allow discovery to proceed on an expedited basis and courts apply a "good cause" standard in determining whether to allow it. See Fed. R. Civ. P. 26(d), 33(a), 34(b); see also *Hard Drive Prods., Inc. v. Doe*, 283 F.R.D. 409, 410 (N.D. Ill. 2012). The Advisory Committee Note to the 1993 amendments to Rule 26(d) expressly note that expedited discovery may be appropriate in cases "involving requests for a preliminary injunction." And courts frequently grant motions for expedited discovery in cases involving trade secrets or trademark infringement in litigation between competitors. See, e.g., *Johnson & Johnson v. Advanced Inventory Management*, Case No. 20-cv-3471, Expedited Discovery Order [docket entry 35] (N.D. Ill. June 16, 2020), clarified in Order [docket entry 121] (N.D. Ill. July 10, 2020); *Mintel*, 2008 WL 2782818, at *7.

Defendants' arguments against expedited discovery are not convincing. The Court has addressed above Defendants' concerns about the appropriateness of proceeding in this forum and the extraterritorial reach (or lack thereof) of the laws at issue. At the same time, the Court agrees

with Defendants that any expedited discovery should be mutual, targeted to matters that will be addressed in a preliminary injunction hearing, and not duplicative of investigations that already have been made. With that said, inspections of devices used by the individuals in question while working for Defendant seems a highly logical place to focus attention in determining whether any of Plaintiffs' trade secrets have been disclosed to and used by Defendant. Neither language nor nationality present compelling barriers to proceeding; translators easily can be employed and the use of remote technology is increasingly prevalent in every phase of litigation, especially during the pandemic. The most challenging issue may prove to be the mechanics of setting up depositions, which as Plaintiffs recognize [see 40, at 20] may need to involve requests to China's "Central Authority under The Hague Evidence Convention" and may need to take place in Hong Kong. These issues will be discussed at the next status hearing.

## IV.    Bond

Federal Rule of Civil Procedure 65(c) directs courts to consider "the amount of the security" that the successful movant for temporary injunctive relief ought to post and leaves both the "matter of requiring a security in the first instance" and its "amount" to the "discretion of the district judge." Plaintiffs submit that no bond should be required because Defendant "should never have stolen Inventus's trade secrets in the first place." Defendant "requests a substantial monetary bond" because the relief sought by Plaintiffs could imperil Defendant's "entire business," but does not provide any further information that might assist the Court in determining what "substantial" means in this context.

The Court declines to dispense with bond altogether, as the extent of the potential incorporation of Plaintiffs' trade secrets into Defendant's business remains unclear—and likely will be clarified through expedited discovery—and thus there is a risk that the temporary relief

may be too broad or may inflict disproportionate reputational harm on Defendant. The Court will therefore order Plaintiffs to post a $50,000 bond. In addition, it is worth noting that the amount of the bond can be adjusted at any time upon motion by either party should the amount initially imposed prove either excessive or insufficient.

## V.     Conclusion

For the reasons explained above, the Court orders as follows: Plaintiff's motion for a temporary restraining order [6] is granted. The Court hereby issues a TRO enjoining ACE, its officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, from performing any of the following actions until at least 14 days from entry of the requested TRO, or any further period during which the TRO is extended, as permitted under the rules or by agreement of the parties:

(1) possessing, accessing, reviewing, using, disclosing, or otherwise misappropriating any Inventus documents, source code, and source code libraries, in whole or in part, including Inventus's confidential information, documents, and source code regarding the design, implementation, testing, manufacturing, and compliance certification of Inventus's battery packs, chargers, and power supplies, as well as Inventus's confidential information and documents regarding Inventus's business strategies;

(2) making, offering to sell, selling, or otherwise distributing anywhere in the world any product developed based on, improved using (through testing or otherwise), or that otherwise utilizes any Inventus documents, source code, and source code libraries, in whole or in part, including Inventus's confidential information, documents, and source code regarding the design, implementation, testing, manufacturing, and compliance certification of Inventus's battery packs, chargers, and power supplies, as well as Inventus's confidential information and documents regarding Inventus's business strategies;

(3) directly or indirectly, calling upon, soliciting, accepting, engaging in, servicing or performing any business from any client or partner of Inventus using any Inventus documents, source code, and source code libraries, in whole or in part, including Inventus's confidential information, documents, and source code regarding the design, implementation, testing, manufacturing, and compliance certification of Inventus's battery packs, chargers, and power supplies, as well as Inventus's confidential information and documents regarding Inventus's business strategies;

(4) destroying, erasing, altering or otherwise disposing of any evidence or other material in any form relating to any Inventus documents, source code, and source code libraries, in whole or in part, including Inventus's confidential information, documents, and source code regarding the design, implementation, testing, manufacturing, and compliance certification of Inventus's battery packs, chargers, and power supplies, as well as Inventus's confidential information and documents regarding Inventus's business strategies, including but not limited to information stored in portable storage media (including but not limited to USB drives, external hard drives, CDs, DVDs, and SD cards), computers, network-based storage services, including in the form that any such information or document was in when it was taken from Inventus, or in any form which it is in at ACE; and

(5) disclosing, using, or divulging any Inventus documents, source code, and source code libraries, in whole or in part, including Inventus's confidential information, documents, and source code regarding the design, implementation, testing, manufacturing, and compliance certification of Inventus's battery packs, chargers, and power supplies, as well as Inventus's confidential information and documents regarding Inventus's business strategies, by the ACE Employees or anyone else employed by ACE, to ACE or any other parties, at any time.

(6) Defendant shall immediately return to Inventus all Inventus documents, source code, and source code libraries, in whole or in part, including Inventus's confidential information, documents, and source code regarding the design, implementation, testing, manufacturing, and compliance certification of Inventus's battery packs, chargers, and power supplies, as well as Inventus's confidential information and documents regarding Inventus's business strategies;

(7) Defendant shall immediately quarantine and identify to Inventus all ACE documents containing any Inventus documents, source code, and source code libraries, in whole or in part, including Inventus's confidential information, documents, and source code regarding the design, implementation, testing, manufacturing, and compliance certification of Inventus's battery packs, chargers, and power supplies, as well as Inventus's confidential information and documents regarding Inventus's business strategies, including Inventus documents that, in whole or in part, have been copied into Defendant's documents;

(8) Defendant shall immediately identify all locations of any Inventus documents, source code, and source code libraries, in whole or in part, including Inventus's confidential information, documents, and source code regarding the design, implementation, testing, manufacturing, and compliance certification of Inventus's battery packs, chargers, and power supplies, as well as Inventus's confidential information and documents regarding Inventus's business strategies, including where they reside within ACE or in devices in the possession of or maintained by ACE's employees or agents;

(9) Defendant shall notify its distributors and resellers of the entry of the TRO, as well as the requirement to comply with the TRO, within four (4) days of entry of the TRO; and

(10) Defendant shall certify in writing to this Court within seven (7) days of entry of the TRO that is has complied with the terms of the TRO.

(11) Plaintiff shall post a bond in the amount of $50,000 with the Clerk of the Court as security; this amount shall be subject to adjustment if, upon subsequent motion of any party, the Court determines that it is either excessive or inadequate.

Plaintiff's motion for discovery [16] is granted in part and denied in part; expedited discovery shall be mutual and limited to the subjects of the preliminary injunction. This case is set for a telephonic status hearing on July 17, 2020 at 10:30 a.m. Counsel should use the Court's toll-free call-in number 877-336-1829, conference access code is 6963747.

Dated: July 13, 2020

_____

Robert M. Dow, Jr.
United States District Judge

34